E. B. GUILD, *as Administrator of the Estate of Charles Dunn, deceased*, v. THE ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY.

No. 3558.

1. VENDOR AND VENDEE —*Specific Performance.* In an action by a vendor to enforce the specific performance of a contract for the sale of lands, the existence of mortgages amounting to far less than the contract price to be paid by the purchaser, and which can be discharged out of the purchase-money, does not constitute a bar to the action.

2. ——— *Appraisers —Revocation of Appointment.* Where a contract in writing, duly signed by the parties, is made, for a valid consideration already passed, for the purchase and sale of lands at a price to be fixed by appraisers to be selected by the parties, and where such appraisers are afterward named, in accordance with the provisions of the contract, and proceed to make a valuation of the property, their appointment cannot be revoked at the pleasure of one of the parties.

3. —— *Defense—Fraud to be Pleaded.* Where fraud, miscon-
duct or mistake is relied upon as a ground for setting aside an
appraisal of lands duly made by appraisers selected in accord-
ance with the agreement of the parties, it must be pleaded.

*Error from Shawnee Circuit Court.*
*Hon. J. B. Johnson, Judge.*

REVERSED AND REMANDED.        OPINION FILED JUNE 6, 1896.

STATEMENT BY THE COURT.

THIS action was instituted by Charles Dunn, as
plaintiff, against the Atchison, Topeka & Santa Fe
Railroad Company, alleging the execution of the writ-
ten contract copied below, the full performance of all
its conditions on his part, and asking judgment for the
sum found by the arbitrators or appraisers to be the
value of the land described in the contract.    The con-
tract is as follows :

" This agreement, made and entered into in dupli-
cate this 17th day of December, 1890, between Charles
Dunn, of Topeka, Shawnee county, Kansas, party of
the first part, and the Atchison, Topeka & Santa Fe
Railroad Company, a corporation duly created and
existing under the laws of the state of Kansas, of the
second part, witnesseth :   That, whereas, the said party
of the first part is the owner in fee simple of the fol-
lowing-described property, to wit :   All that tract or
parcel of land in the city of Topeka, county of Shaw-
nee, state of Kansas, lying between Eighth avenue
and Ninth street in said city, and bounded on the east
by Washington street, and on the west by Charles
street, consisting of lots 265, 267, 269, 271, 273, 275,
277, 279, 281, 283, 285 and 287, fronting on Charles
street, and lots 229, 231, 233 and 235, fronting on
Eighth avenue east, together with fractional lot or lots
situated between said lot 235 on Eighth avenue east
and Washington street ; and whereas, the said party of
the second part has heretofore constructed and is now
operating its line of railroad over and upon a portion
of the above-described premises without first having
obtained right of way therefor ; and whereas, it is

the desire of both parties to this contract that all matters in dispute in relation to said land may be amicably settled without litigation, and that said party of the second part may be permitted to acquire the fee-simple title to all of the above-described premises : Now, therefore, in consideration of the above-recited premises, and further valuable considerations not herein mentioned, it is hereby mutually stipulated and agreed as follows :

"1. The party of the second part shall, within 10 days from the execution of this agreement, select some disinterested person to act as arbitrator, and upon such selection being made, shall notify the party of the first part of such selection, and said party of the first part shall, within 10 days thereafter, select one arbitrator, and in case said arbitrators shall be unable to agree upon the matters and things to be submitted to them as hereinafter provided, they shall select a third arbitrator, and a decision of a majority of said arbitrators of all the matters and things to be submitted to them as hereinafter provided shall be final and binding upon the parties to this contract.

"2. Said arbitrators, so selected, shall appraise all of the above-described premises at their fair cash valuation, and said party of the second part hereby agrees that it will pay to said party of the first part the amount so appraised by said arbitrators in the manner and at the times hereinafter set forth, upon the execution to it by said party of the first part of a good and sufficient warranty deed in fee simple to all of said premises, free and clear of all incumbrances.

"3. Said party of the second part is to pay to said party of the first part one-fourth of the value of said property as ascertained and declared by said arbitrators within 30 days after the date of their award, and upon the execution by said party of the first part of a good and sufficient warranty deed for said premises as hereinbefore provided, and shall, at this time, give to said party of the first part its non-negotiable notes for the balance of said award, payable as follows : One-fourth of the entire amount 90 days after the date of the award, and one-half of the entire amount payable six months after the date of said award, said notes to

bear interest at the rate of 6 per centum per annum from the date of the award.

"4. The appraisement of said premises as hereinbefore provided shall be on the basis of the cash valuation of the naked land, without considering the value of any improvements which may have been placed thereon by the party of the first part, and it is hereby understood and agreed that said party of the first part shall, at his own expense, remove from said grounds all improvements belonging to him which have been placed thereon, within six months from the date of the award as hereinbefore provided.

"5. It is further stipulated and agreed, that the moneys to be paid under this contract shall be paid through the Bank of Topeka, in the city of Topeka, and the deed to be executed by the said party of the first part shall be executed on or before the time of the first payment to be made by the said party of the second part, and placed in escrow in the Bank of Topeka to be delivered to said party of the second part upon the final payment of the notes to be executed as hereinbefore provided; which notes shall also be placed in escrow in said Bank of Topeka with said deed, to be held by said bank until paid, and upon final payment of the last of said notes, said deed shall be delivered by said bank to said party of the second part.

"6. Said party of the first part in consideration of the payment of the award hereinbefore provided for, upon the terms and conditions hereinbefore provided, agrees to waive, and does hereby waive, all claims of every name and nature, class or description, which he has had or now has, against said party of the second part, on account of the occupancy of said above-described premises by the said party of the second part.

"In testimony whereof, the parties hereto have executed this instrument in duplicate, the day and year first above written.                CHARLES DUNN,
*Party of the first part.*
ATCHISON, TOPEKA & SANTA FE RLD. CO.,
*by A. A. Robinson, its Vice-Pres. and Gen. Manager.*
"Witness: WM. G. SMYSER, as to Chas. Dunn,
B. F. LEWIS, as to A. A. Robinson."

The defendant answered admitting the execution of the written agreement, but denying generally the other allegations of the petition, and alleging that the premises were incumbered by two mortgages for a large amount, which were past due and unpaid, denying that C. W. Jewell, was ever legally appointed an arbitrator, or that any arbitration was ever had under the contract, and alleging that prior to any action by the arbitrators fixing the amount to be paid for the land, the agreement to arbitrate was revoked by the defendant, and notice thereof served on the plaintiff and the arbitrators.

It was shown on the trial that, in pursuance of this contract, the railroad company designated P. I. Bonebrake, as one of the arbitrators, and notified Dunn accordingly. Dunn thereupon chose J. B. Whitaker. Bonebrake and Whitaker met and consulted with reference to the valuation of the property, but were unable to agree. On December 27, 1890, Bonebrake sent a letter to Mr. Whitaker, saying, "We seem to be so far apart on the appraisement of the Dunn land that I think it would give better satisfaction to both parties to call in a third man. I therefore suggest a list of names and you choose either of them and it will suit me." Nine persons were named in the list. Whitaker selected C. W. Jewell, and notified Bonebrake of his choice. The three afterward met at Bonebrake's office. Jewell made figures and submitted them. The figures were not satisfactory to Bonebrake, who was unwilling to agree to them. Two or more meetings were held, but the appraisers failed to agree. On the 3d day of January, 1891, a notice, signed by the railroad company by A. A. Robinson, second vice-president and general manager, was addressed and delivered to Messrs. Bonebrake, Whitaker, and Jewell, notifying them that the railroad company desired to

be heard, and to be permitted to introduce evidence and submit arguments on the questions to be considered. It was admitted at the trial by the defendant that the purpose of serving this notice was to keep the arbitrators from making an award until notice of withdrawal of submission to arbitration could be served on them. On the 5th day of January a notice signed by the railroad company by Robinson was addressed to and served on Bonebrake, Whitaker, and Jewell, notifying them that the agreement to submit certain questions to arbitration under the written contract above mentioned was revoked. After the service of this notice, Bonebrake, deeming his authority at an end, declined to take any further action. On the following day Whitaker and Jewell took an oath as appraisers to appraise the land at a fair cash valuation in accordance with the contract, and made an appraisement in writing, valuing the land at $29,586. The plaintiff and his wife executed a warranty deed with covenants against incumbrances to the railroad company for the land described in the contract, and tendered it to Robinson, as the representative of the company. The company refused to accept it, and the plaintiff deposited the deed in the Bank of Topeka, together with a written power of attorney authorizing John R. Mulvane, president of the bank, to receive the purchase-money and out of it to pay two certain mortgages, one for $6,000, and the other for $4,000, which were incumbrances on the land.

On cross-examination of Whitaker, he stated that he considered Bonebrake a representative of the railroad company and himself a representative of the plaintiff, and that he was to get the highest price he could for the land. The case was submitted to the court without a jury, and a general finding was made

in favor of the defendant and judgment entered accordingly. The plaintiff brings the case here for review.

*John W. Day*, for plaintiff in error; *Francis C. Downey*, of counsel.

*A. A. Hurd*, *O. J. Wood*, and *W. Littlefield*, for defendant in error.

The opinion of the court was delivered by

ALLEN, J. : ⌈The answer of the defendant presented two principal issues : (1) That the land described in the contract was incumbered, and the plaintiff therefore unable to convey a perfect title; (2) that the authority of the arbitrators was revoked before an award was made. The principal question for our consideration is whether or not either of these defenses was good under the facts disclosed.

1. ⌈It appears that the land was incumbered by mortgages amounting to $10,000 and some interest. Does the existence of an incumbrance on land contracted to be sold defeat specific perform-

1. Effect of incumbrances.    ance of the contract, where the amount of the incumbrance is much less than the amount of the purchase-money, so that the incumbrance can be completely discharged from the proceeds of the sale? It is well settled that the purchaser will not be compelled to receive and pay for a defective title. (Fry, Spec. Perf. § 859 ; *Watts et al. v. Waddle et al.*, 6 Pet. 391 ; *Jeffries v. Jeffries*, 117 Mass. 184 ; *Bowen v. Vickers*, 1 Green Ch. 520.) Nor can a purchaser be compelled to accept a title subject to incumbrances, for the payment of which out of the purchase-money provision cannot be or is not in fact made. (*Hinckley v. Smith*, 51 N. Y. 21 ; *Walsh v. Bar-*

*ton et al.*, 240 Ohio St. 28 ; *Mayer & Morgan v. Adrian & Vollers*, 77 N. C. 83.) .Nor can the purchaser be compelled to receive a deed conveying an incumbered title, and be forced to rely on the vendor's covenants for his security against existing incumbrances, unless he has expressly agreed to do so. But where an incumbrance can be removed merely by the application of the purchase-money, and the court is able to provide for the conveyance of a clear title to the vendee, the mere fact that incumbrances exist which the plaintiff has not removed, or even is unable to remove without the application of the purchase-money for that purpose, will not prevent a decree for a specific performance. (*Guynet v. Mantel*, 4 Duer, 86 ; *Halsey v. Grant*, 13 Vesey, 73 ; *Oakey v. Cook*, 7 Atl. Rep. [N. J.] 495 ; *Thompson v. Carpenter*, 4 Pa. St. 132.) It appears from the evidence of Dunn that the fact that the property was incumbered by a mortagage was known to Robinson, who said that would make no difference ; that it could be arranged out of the proceeds. This evidence is uncontradicted. As the amount of the incumbrances was but little more than one-third the proceeds of the sale, especially in view of the defendant's knowledge and statement with reference thereto, they did not constitute a valid ground for refusing specific performance of the contract. Nor does the fact that one-half the taxes for the year 1890 remained unpaid, even though unknown to the defendant, furnish any obstacle to the performance of the contract. The fund was ample for their payment.

II. The contract executed by the parties provided for the sale of the plaintiff's land to the defendant at a price to be fixed by what are denominated, in the contract, as arbitrators. It is not disputed that Mr. Bonebrake was named as one of the arbitrators by the

defendant, and that Mr. Whitaker was named as another by the plaintiff, though the appointment of Mr. Jewell, as the third, is questioned. We think the evidence clearly shows his selection by the other two as the third arbitrator, and that he was recognized as such by both parties. The evidence shows that Bonebrake and Whitaker first attempted to fix a price; that they were unable to agree; that, thereupon, Jewell was selected, and that the three had two or more consultations, at which they endeavored to agree on a price. Bonebrake's figures were lower than those of the others. The railroad company attempted to revoke the authority of the arbitrators. A question is presented whether

2. Revocation of appointment of appraisers.

they were arbitrators, or merely appraisers selected to value the property, and if the latter, whether the defendant could still revoke their authority before the appraisement was actually made. An arbitration is properly a submission to the decision of one or more persons of a matter in controversy or dispute between the parties. The only matter these persons were called upon to decide was the value of the land, which, according to the evidence, had not been discussed by the parties. Before the execution of the contract the defendant had taken possession of a portion of this land, and constructed its tracks along the edge of it. The plaintiff was claiming damages for the use and occupation of his property, and insisting on their payment. With reference to this claim there was a controversy, but by the written contract it was agreed that the claim should be waived, and that the land should be sold by the plaintiff to the defendant at a price to be fixed by arbitrators. The arbitrators were not named in the contract, and, of course, there could be no specific performance of it until they were se-

lected.  They were, however, afterward named.  The
question is, then, whether or not the. defendant, by
revoking the appointment, could in effect annul the
contract.

It must be borne in mind that the railroad company
was still in possession of a part of the property,
wholly without right, and was during all of the time
liable to the plaintiff for whatever actual damage he
had sustained by reason of the defendant's occupation
of his property.  The contract contemplated, and
provided, not merely that the plaintiff should sell and
the defendant should buy the whole tract of land, but
that such purchase and sale should cancel all demands
of the plaintiff for what had already been done.  The
authorities recognize a distinction between appraisers
of value or persons selected to make a
measurement or computation under such
a contract, and arbitrators properly so
called.  Conditions are frequently attached
to policies of insurance providing that, in case differ-
ences arise between the parties touching a loss, the
matter shall be submitted to arbitrators.  Where these
provisions are in such form that they require the sub-
mission of every controversy that may arise under the
policy to arbitrators, and thus in terms oust the
courts of all jurisdiction in the matter, they are held
invalid ; but where they merely provide for the sub-
mission to arbitrators of the question as to the amount
of loss sustained, so that the arbitrators have nothing
to do but make an appraisement of the property de-
stroyed, if definite and reasonable in their provisions,
they are generally sustained, and held to be, when so
expressly stated in the policy, conditions precedent to
a recovery.  ( *Insurance Co. v. Clancy,* 71 Tex. 5 ;
*Chippewa Lumber Co. v. Ins. Co.,* 80 Mich. 116 ; *Manu-*

3. Appraisers
distinguished
from arbi-
trators.

*facturing Co. v. Assurance Co.*, 106 N. C. 28 ; *Wolff v. Insurance Co.*, 50 N. J. L. 453 ; *Chandos and another v. American F. Ins. Co., of Philadelphia*, 84 Wis. 184.) If appraisement may be made a valid condition precedent to the maintenance of an action, of course, when the appraisement is made in accordance with the contract, it is binding on the parties. For other instances in which the distinction between an arbitration, which shall have the effect completely to dispose of a matter in controversy between the parties, and an appraisal of property, or determination of any matter of quantity or the like, see the following authorities : Russ., Arb. 40 ; *Garred v. Doniphan*, 10 Mo. 161 ; *Curry v. Lackey*, 35 id. 389 ; *Atkinson v. Whitney*, 67 Miss. 655 ; *Collins v. Collins*, 26 Beav. 306 ; *Garr v. Gomez*, 9 Wend. 649. In *Morse v. Merest*, 6 Madd. 27, it was held that, where a defendant refused to permit appraisers to go upon the land, the court would remove the impediment and direct the defendant to permit valuation to be made. *Smith v. Peters*, ( L. R.) 20 Eq. Cases, 511, is to the same effect. In *Rochester v. White-house*, 15 N. H. 468, it was held that the appointment of appraisers might be revoked the same as that of arbitrators. On the other hand, see *Orne, Appellant, v. Sullivan*, 4 Miss. 161. Where the parties to an action have entered into an arbitration and made the same a rule of the court, the submission is not revocable. ( 1 Am. & Eng. Encyc. Law, 664 ; Morse, Arb. 232.) But mere naked arbitration is generally held revocable at the pleasure of either party at any time before an award is made. ( *Boston & L. Rld. v. Nashua & L. Rld.*, 139 Mass. 463 ; Morse, Arb. 229 ; Russell, Arb. 156.)

It would seem to be settled, under the authorities, that where there is an agreement for the purchase and

sale of lands or chattels to be appraised by third par-
ties, and such agreement is upon a valid consideration,
and where the appraisement is rather an incident of
the contract than a single subject of agreement be-
tween the parties, one party may not retain an ad-
vantage gained by the contract and revoke the authority
of the appraisers. (*McGheehen v. Duffield*, 5 Pa. St. 497;
*The Bank of Monroe v. Widner*, 11 Paige Ch. 529; *At-
kinson v. Whitney*, supra.)   The English cases go so
far as to hold that a court will remove obstacles placed
by the vendor in the way of the appraisers in perform-
ing their duties, as held in *Morse v. Merest*, and *Smith
v. Peters*, supra.

The plaintiff had agreed that he would sell his land
to the defendant at a price to be fixed by the apprais-
ers.   He had also agreed that, in consideration that
the defendant would purchase on those terms, he
would relinquish all claims for damages already due
him from the defendant for the use of it.   After the
appraisers were appointed in accordance with the terms
of the contract, he could not have sued the defendant
for the occupation of his land without revoking not
merely the appointment of the appraisers, but his
solemn written agreement.   This he had no right to
do.   Nor had the defendant any better right to retreat
from and annul its solemn agreement than had the
plaintiff.   The settlement of past differences on the
basis of the purchase and sale of the land at a value
to be fixed by the appraisers was a valid consid-
eration for the agreement, and sufficient to render the
contract irrevocable.   An appraisement having been
made by a majority of the appraisers, the contract be-
came complete in all its parts and enforceable spe-
cifically, unless other equitable considerations are
found constituting a valid defense.

6—57 KAS.

Guild v. Railroad Co.

III. On cross-examination, the appraiser Whitaker made statements indicating partiality. If the appraisement had been challenged by the answer for fraud, mistake, or misconduct of the appraisers, we might hesitate about holding the appraisement binding. But there was no such claim put forth in the answer, and it is clearly necessary that misconduct should be pleaded if relied upon. It seems to us evident that the trial court decided either that the incumbrances constituted a bar to the plaintiff's action, or that the defendant could lawfully, and did in fact, revoke the authority of the arbitrators, and that the case was decided on the issue presented by the pleadings under an erroneous conception of the law.

*4. Fraud, mistake, or misconduct must be pleaded.*

The judgment is therefore reversed and a new trial awarded.

MARTIN, C. J., concurring.

JOHNSTON, J., dissenting: There are two reasons which, in my view, require an affirmance of the judgment of the trial court: First, the agreement to arbitrate appears to have been revoked before the award was made. There was a substantial dispute between the parties which was a proper subject of arbitration. Both parties proceeded upon the theory that an arbitration was to be had, and in their agreement it will be observed that they distinctly designated the proposed proceeding as an arbitration. It is well settled and appears to be conceded that an agreement to submit a matter to arbitration is revocable by either party at any time before an award has been made. There was an express and absolute revocation in this case by one of the contesting parties, and it was made before any change of the status of either party had taken place.

No equitable considerations can therefore be urged against the abrogation of the agreement.'

In the second place, specific performance could not be decreed, because there was in fact no award or appraisement made.   According to the contract the matter was to be submitted to the arbitration of disinterested persons, who, it was expected, would fairly and equitably adjust the difference between the parties.   When the revocation occurred, Mr. Bonebrake, one of the arbitrators, concluded that the arbitration was ended, and declined further participation in it. Two of the arbitrators subsequently proceeded to an award.   One of them, however, confessed upon the witness-stand that he was not a disinterested and impartial arbitrator.   On the other hand, he stated that he considered himself the special agent or representative of the party who appointed him, and that it was his duty, not to fix the actual value of the land, but to get the highest price possible from the other party. It therefore appears that the award, instead of being the judgment and decision of three disinterested arbitrators, as the parties contemplated and the agreement provided, is but the judgment of one, and one, too, who may have been influenced by the partial and prejudiced arbitrator who joined with him in making the award.   What weight should be given to the finding of an arbitrator who admits both interest and bias?   And as the disqualification was confessed, why should a court of equity interpose to enforce the decision?   The award is entitled to no more credit than it would be if, without the knowledge of the other parties, Dunn himself had been substituted and had acted in the place of the incompetent arbitrator.   As the plaintiff's appeal is to equity, he must be governed by equitable rules and principles, and in my view the

facts and circumstances surrounding this transaction and award are not such as entitle the plaintiff to the equitable remedy which he seeks.   Proof of the disqualification and incompetency having been shown by the plaintiff himself, and having been received and acted on by the trial court, it is too late to object that it was not pleaded in the answer or embraced in the issues of the case.